## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

   Plaintiff,

**v.**                 **No. 14-cr-1261 RB**

**PAWANKUMAR JAIN, M.D.,**
**a.k.a. "Pawan Kumar Jain,"**

   Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### AND ORDER DENYING DEFENDANT'S OBJECTIONS TO THE PSR

In February 2016, Dr. PawanKumar Jain pled guilty to two counts of unlawfully dispensing a controlled substance and health care fraud. These counts related to his treatment of his patient MEB.[1] MEB died on December 25, 2009, two days after filling a methadone prescription written by Dr. Jain. Dr. Jain admitted that the methadone prescriptions he wrote MEB preceding her death fell outside the usual course of medical practice and had no legitimate medical purpose. Dr. Jain has made three formal objections to his Presentence Investigation Report (PSR): (1) to the inclusion of *all* the opioid prescriptions listed in the indictment, which he wrote to ten different patients, as relevant conduct in calculating his base offense level; (2) to the upward adjustment for a large number of vulnerable victims; and (3) to references to the cause of death of some of the patients named in the indictment.[2]

The Court held an evidentiary hearing on these objections which began on November 20, 2018, and continued on December 5 and 6, 2018. Having considered the submissions of counsel,

---

[1] The Court will use the initials of Dr. Jain's patients, as used in the Second Superseding Indictment (Doc. 64) and the parties' proposed findings of fact and conclusions of law. (Docs. 115; 116.)

[2] Dr. Jain orally withdrew a fourth objection—to the upward adjustment for MEB being a vulnerable victim—at the evidentiary hearing. (*See* Vol. I of Tr. of Evidentiary Hr'g (Tr. I) at 10.)

the record, relevant law, and being otherwise fully advised, the Court issues these findings of fact and conclusions of law and will **deny** Dr. Jain's objections to the PSR.

## FINDINGS OF FACT

"[W]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). The Court must "for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). At the evidentiary hearing the Court heard testimony from Dr. Stacey L. Hail, M.D., Dr. Graves T. Owen, Michael Garrett Shavier, Laura Rose Duran, and DEA Special Agent Jeffrey Castillo. Based on the hearing and the record, the Court makes the following findings of fact proven by a preponderance of the evidence:

1. Dr. Graves Owen is an expert in the field of pain management. (Vol. I of Tr. of Evidentiary Hr'g (Tr. I) at 167.)

2. The standard of care is what a reasonable and prudent physician would do in the same or similar circumstances, though there is some grey area about what is appropriate. (*Id.* at 170, 218.)

3. Practices that fall below the standard of care include failure to: practice evidence-based medicine; maintain reliable, credible, and legible medical records; perform the appropriate medical evaluation process to establish the outcome of previous treatments; obtain comprehensive previous medical records; perform and document an appropriate medical history; and perform and document an appropriate and reliable physical exam. (*Id.* at 170; Gov't Evidentiary Hr'g Ex. 8 (Gov't Ex. 8)[3] at 2–4.)

---

[3] Exhibit 8 is a consolidated version of Dr. Owen's first and second expert reports, which are also filed as Doc. 98-1.

4. Although the experience of pain is a subjective experience, assessing the body's ability to function, such as the length of time a person can sit and stand, and how far the person can walk, provides a more objective manner for a pain doctor to accurately assess and treat pain. (Tr. I at 172.)

5. In the field of pain management, the standard of care includes the exhaustion of conservative, evidence-based treatment options before treating a patient with high-risk, non-evidence-based treatment options. This is referred to as the "first do no harm" doctrine. (*Id.* at 170.)

6. Conservative evidence-based options for the treatment of pain include: exercise, yoga, pilates, physical therapy, cognitive behavioral therapy, acupuncture, and chiropractic manipulation. (*Id.* at 173.)

7. Chronic opioid therapy is a high-risk treatment option. (Gov't Ex. 8 at 25.)

8. Reasonable and prudent physicians should consider risk factors like vulnerable mental or emotional conditions before prescribing opioids for pain management. (Tr. I at 171.)

9. Pain patients who have risk factors for addiction or misuse of pain medications are at a higher risk for opioid addiction because they are more vulnerable to the use of opioid prescriptions to chemically cope or self-medicate. These risk factors include: a family or personal history of alcoholism or drug addiction; mental health problems, including anxiety and depression; impulse control problems including OCD, ADD, bipolar disorder, schizophrenia, and personality disorders; hyper-vigilant states such as Post-Traumatic Stress Disorder; a history of abuse; and being under the age of 45. (*Id.*)

10. Aberrant drug taking behaviors are behaviors outside the boundaries of the treatment plan, including running out of prescribed drugs early, obtaining controlled substances from multiple

sources, and behaviors that may be detected by a urine drug test like taking illegal drugs or not taking the prescribed substances. (*Id.* at 176; Gov't Ex. 8 at 20.)

11. Failure to monitor compliance with the prescribed use of controlled substances and take appropriate corrective action to address aberrant drug taking behaviors is below the standard of care. (Gov't Ex. 8 at 20.)

12. Corrective action could include warning the patient, testing their urine for drugs, asking them to come in more frequently for assessment, ceasing to prescribe the controlled substances, or even discharging them from the practice. (Tr. I at 178.)

13. Failure to monitor for adverse events such as liver toxicity and sleep apnea in patients receiving chronic opioid therapy is below the standard of care. (Gov't Ex. 8 at 25.)

14. Dr. Owen reviewed 23 of Dr. Jain's patient files to determine whether Dr. Jain met the standard of care in prescribing controlled substances to each of those patients, including the 10 patients who were named as victims in the Second Superseding Indictment (the Indictment). (Tr. I at 174.)

15. Dr. Owen opined that none of the prescriptions that Dr. Jain wrote to MEB for methadone and oxycodone from April 23, 2009 to November 25, 2009, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (*Id.* at 174–75.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

    a. MEB presented the following risk factors for addiction or aberrant drug-taking behavior: 39 years old, obtaining multiple opioids from multiple providers, anxiety, depression, and bipolar symptoms. (*Id.* at 177–80.)

b. Dr. Jain did not obtain and review all of MEB's pertinent medical records before he began treating her pain with controlled substances. (*Id.* at 175.)

c. While MEB was under Dr. Jain's care, he received several letters from agencies and other providers notifying him that MEB was receiving narcotic medications from multiple providers, but he still prescribed MEB controlled substances. (*Id.* at 199; Vol. III of Tr. of Evidentiary Hr'g (Tr. III) at 25–27.)

d. Dr. Jain performed superficial evaluations by not conducting adequate problem-focused physical exams and not taking adequate medical history each time Dr. Jain saw MEB and before he prescribed controlled substances to MEB. (Tr. I at 176.)

e. There is no documented explanation of alternate pain treatment choices in MEB's pain management contract, executed November 7, 2008. (*Id.* at 176–77.)

f. Dr. Jain did not exhaust conservative care options before treating MEB's pain with controlled substances. (*Id.* at 181–82.)

g. Dr. Jain failed to document a therapeutic benefit, or improvement to MEB's pain, from the prescribed controlled substances. (*Id.*)

16. As part of his plea agreement, Dr. Jain admitted that the final two methadone prescriptions he wrote to MEB were issued outside the usual course of medical practice and without a legitimate medical purpose. (Doc. 81 at 4.)

17. Dr. Owen opined that Dr. Jain's July 27, 2010 prescription of oxycodone to ND was not written for a legitimate medical purpose, and was outside the scope of medical practice. (Tr. I at 182.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

a. ND's patient file lacked a documented therapeutic benefit for oxycodone. (*Id.* at 182–83.)

b. There is no evidence that Dr. Jain conducted urine drug testing of ND before prescribing controlled substances. (*Id.* at 183.)

c. Dr. Jain did not document any evaluation of risk factors for aberrant drug taking behavior like unstable behavioral and mental health issues, even though a form in ND's file notes "depression, anxiety, psychiatric treatment, mood swings, and sleep disturbances." (*Id.* at 183–84; Vol. II of Tr. of Evidentiary Hr'g (Tr. II) at 74–76; Gov't Ex. 15.)

d. ND had received prescriptions from a nurse practitioner about a week before her visit with Dr. Jain, but Dr. Jain did not obtain any of ND's prior medical records prior to prescribing controlled substances. (Tr. I at 123, 211–12; Tr. III at 23–24.)

18. Dr. Owen opined that none of the prescriptions that Dr. Jain wrote for morphine sulfate to RB from October 30, 2009 to June 7, 2010, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (Tr. I at 184.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

a. RB's patient file revealed superficial evaluations and failure to assess function. (*Id.* at 185.)

b. There is no evidence that Dr. Jain followed up on risk factors for aberrant drug-taking behavior such as anxiety, depression, and nicotine addiction, nor that he took corrective action following a urine drug test that was positive for THC. (*Id.* at 185–86.)

c. Dr. Jain failed to document medical necessity or therapeutic benefit for prescribed treatments with controlled substances. (Gov't Ex. 8 at 35–36.)

19. Dr. Owen opined that none of the prescriptions for oxycodone that Dr. Jain wrote to TB from December 14, 2009 to June 14, 2010, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (Tr. I at 186–87.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

    a. Dr. Jain failed to address TB's anxiety and depression that he noted on intake forms. (*Id.* at 187.)

    b. Dr. Jain did not obtain TB's pertinent previous medical records before prescribing controlled substances. (Gov't Ex. 8 at 42.)

    c. Dr. Jain conducted superficial evaluations with poor documentation. (Tr. I at 187.)

    d. Dr. Jain did not document therapeutic benefits for the opioids prescribed to TB. (*Id.*)

    e. Dr. Jain required TB to provide a urine sample on June 14, 2010, which came back positive for cocaine on June 17, 2010. (*Id.* at 223; Def. Ex. K.)

    f. It appears that Dr. Jain made the decision to discharge TB from his practice based on the test that came back positive for cocaine, but he prescribed oxycodone to TB on the same day he required the urine sample, prior to receiving the lab results. (Tr. I at 62, 224; Def. Ex. K.)

20. Dr. Owen opined that none of the prescriptions for methadone and oxycodone that Dr. Jain wrote to MJB from May 26, 2009 to March 24, 2010, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (Tr. I at 187–88.) Dr. Own based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

a. MJB had a history of sleep apnea, which increases the risk that a patient who is prescribed opioids will die. Dr. Jain noted the sleep apnea on MJB's patient intake form but did not follow up. (*Id.* at 188.)

b. Dr. Jain knew that MJB had exhibited recreational drug and alcohol use, which are risk factors for aberrant drug taking behavior. (*Id.*)

c. Dr. Jain did not obtain MJB's pertinent previous medical records. (Gov't Ex. 8 at 44.)

d. Dr. Jain did not document the therapeutic benefits of the opioids he prescribed MJB and his examinations were cursory and poorly documented. (*Id.* at 44–47.)

21. Dr. Owen opined that none of the prescriptions for oxycodone that Dr. Jain wrote to SC from June 2, 2009 to June 24, 2010, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (Tr. I at 188.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

a. SC's file included multiple references to personal and family history of psychiatric problems like anxiety, depression, suicidal ideations, and other risks of aberrant drug taking behavior. (*Id.* at 188–89; Gov't Ex. 8 at 47.)

b. Dr. Jain indicated in SC's file that she had been involved in six motor vehicle accidents as well as a fall that caused pain. (Tr. I at 227.)

c. Dr. Jain's files do not note whether SC had been prescribed opioids for pain she attributed to the car crashes and subsequent fall, but he prescribed her an opioid dosage that would be very high for an opioid-naïve individual. (Gov't Ex. 8 at 47.)

d. SC's previous medical records were not obtained. (*Id.*)

e. Various diagnoses were made without supporting documentation, sometimes in conflict with MRI results. (*Id.* at 48.)

      f.   Dr. Jain did not document therapeutic benefits of opioid treatment, and SC's oxycodone dosage was increased over time without documented medical rationale. (*Id.* at 48–49.)

22. Dr. Owen opined that none of the prescriptions for oxycodone, amphetamine/dextroamphetamine, and hydromorphone that Dr. Jain wrote to AU from June 24, 2009 to June 3, 2010, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (Tr. I at 189.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

      a.   Dr. Jain noted that AU had risk factors for aberrant drug taking behaviors like anxiety, depression, and suicidal ideations but did not follow up. (*Id.* at 188–89.)

      b.   Dr. Jain's evaluations of AU were superficial, and her patient records contained illegible comments. (Gov't Ex. 8 at 66.)

      c.   Dr. Jain did not document reliable therapeutic benefits from the prescribed controlled substances, nor that he exhausted conservative treatments prior to treatment with controlled substances. (*Id.*)

      d.   Dr. Jain noted an aberrant urine drug test that was negative for the prescribed oxycodone, which could have indicated that AU was selling her pills or taking higher dosages and then running out early, but he did not follow up with corrective action. (*Id.* at 68.)

23. Dr. Owen opined that none of the prescriptions for morphine sulfate and hydromorphone that Dr. Jain wrote to LD from May 11, 2011 to February 23, 2012, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (Tr. I at 190.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

a. Dr. Jain's patient file for LD included blank pain assessment forms. (*Id.*)

b. LD exhibited depression, anxiety, bipolar disorder, and marital stress. (Gov't Ex. 8 at 77.)

c. Dr. Jain's various diagnoses were not supported by documentation, and he did not document a reliable therapeutic benefit from the controlled substances. (*Id.* at 77–78.)

d. Dr. Jain noted that he checked the prescription monitoring database in September 2011, which would have indicated that LD was obtaining opioids and benzodiazepines from other doctors. (*Id.* at 78.)

e. Dr. Jain did not take corrective action even after documenting aberrant urine drug test results. (Tr. I at 190–92.)

24. Dr. Owen opined that none of the prescriptions for oxycodone and hydromorphone that Dr. Jain wrote to BL from October 28, 2011 to February 13, 2012, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (*Id.* at 192.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

a. Dr. Jain noted various risk factors for aberrant drug-taking behavior in BL's patient file, including BL's prior diagnoses of opioid addiction and chronic binge-drinking and alcohol addiction. (*Id.* at 192–93.)

b. BL had a history of depression and anxiety as well as obstructive sleep apnea. (Gov't Ex. 8 at 2-17; Tr. I at 230–31.)

c. Dr. Jain did not document a medical rationale or therapeutic benefit for various prescriptions, dosage adjustments, and early refills of controlled substances. (Gov't Ex. 8 at 2-21.)

d. Dr. Jain suspected BL had overdosed on opioids but continued to prescribe them. (*Id.* at 2-18–2-19.)

e. Dr. Jain did eventually discharge BL from his practice, but he continued to prescribe controlled substances while she was his patient. (Tr. I at 232.)

25. Dr. Owen opined that none of the prescriptions for methadone that Dr. Jain wrote to LT from April 4, 2011 to July 6, 2012, were written for a legitimate medical purpose, and they were outside the scope of medical practice. (*Id.* at 193.) Dr. Owen based his opinion on evidence of deviations from the standard of care in prescribing narcotics, including:

a. LT's patient file revealed superficial evaluations and blank pain assessment tools. (Gov't Ex. 8 at 2-14–2-15.)

b. LT self-disclosed that he had been addicted to heroin for six years. (Tr. I at 193.)

c. LT was referred to Dr. Jain by another physician (*id.* at 234), but Dr. Jain did not obtain pertinent previous medical records. (Gov't Ex. 8 at 2-14.)

d. Dr. Jain never documented reliable therapeutic benefits to LT from methadone. (*Id.* at 2-16.)

26. Dr. Stacey Hail is an expert in emergency medicine and medical toxicology with the ability to render an expert opinion in the cause of death. (Tr. I at 43.)

27. A post-mortem medical examination, the circumstances surrounding the death, and an evaluation of whether the individual exhibited a particular "toxidrome" are all relevant to determining that individual's cause of death. (*Id.* at 43–46.)

28. A toxidrome is the constellation of signs and symptoms, unique to a substance or group of substances, that are exhibited by a patient who has ingested toxic levels of that substance or group of substances. (*Id.* at 24–25.)

29. A person who overdoses on opioids or opiates will exhibit the "opioid toxidrome." (*Id.* at 25–26.)

30. A person who exhibits the "opioid toxidrome" that results in death may exhibit the following signs and symptoms: pinpoint pupils; central nervous system depression demonstrated by acting more and more sluggish and sleepy until unconscious and unable to be aroused; and respiratory depression demonstrated by progressively slower breathing leading to agonal respiration or obstructive breathing until all breathing finally ceases, often resulting in a pulmonary edema. (*Id.* at 26–29.)

31. A person who overdoses on a stimulant, such as cocaine or methamphetamine, will exhibit the "sympathomimetic toxidrome," which mimics the body's sympathetic nervous system, or "fight-or-flight" response. (*Id.* at 30.)

32. A patient who is exhibiting the "sympathomimetic toxidrome" that results in death may exhibit the following signs and symptoms: big pupils; awake and agitated; elevated heart rate; sweaty; seizures; and possibly a lethal arrhythmia—an abnormal heartbeat leading to death which leaves no trace in the body post-mortem and is thus considered a diagnosis of exclusion. (*Id.* at 30–33.)

33. Dr. Hail reviewed the files of nine of Dr. Jain's patients, seven of whom are named as victims in the Indictment. (*Id.* at 43–44; Gov't Evidentiary Hr'g Ex. 2 (Gov't Ex. 2).[4])

34. In addition to the patient files, Dr. Hail also reviewed available police reports, witness statements, death scene photographs, pill counts, autopsy reports, prescription records, and post-mortem toxicology reports for each of the nine patients she reviewed. (Tr. I at 44–45.)

---

[4] The Government's Exhibit 2, Dr. Hail's Expert Report, is also filed as Doc. 98-2.

35. Dr. Hail opined that four patients named in the Indictment—MEB, ND, RB, and TB—would not have died but for opioid medications prescribed to them by Dr. Jain. (*Id.* at 45; Gov't Ex. 2.) Dr. Hail based her opinion on the following evidence:

    a. On December 23, 2009, MEB filled a prescription for methadone from Dr. Jain. (Tr. I at 47.)

    b. Two days later, on December 25, 2009, MEB was found dead on a couch, where she had been sleeping the night before, consistent with an opioid death. (*Id.* at 48.)

    c. MEB's death cannot be attributed to any trauma or natural causes. (*Id.*)

    d. Although alprazolam, quetiapine, and venlafaxine were in MEB's post-mortem toxicology results, none of these drugs would have caused MEB's death. (*Id.* at 48–52.)

    e. On July 27, 2010, at her first and only visit with him, Dr. Jain prescribed oxycodone to ND. (*Id.* at 52.)

    f. Two days later, on July 29, 2010, ND was found dead in her bed where she had been sleeping. (*Id.* at 53.)

    g. Earlier on the morning of July 29, 2010, ND was snoring and then stopped breathing, which is consistent with the opioid toxidrome. (*Id.* at 53–54.)

    h. ND's death cannot be attributed to any trauma or natural causes. (*Id.* at 54.)

    i. Although sertraline and butalbital were present in ND's post-mortem toxicology results, neither of these drugs would have caused ND's death. (*Id.* at 54–55.)

    j. RB filled a prescription for morphine from Dr. Jain on August 11, 2010. (*Id.* at 56.)

    k. Three days later, on August 14, 2010, RB was found dead in his bed where he had been sleeping. (*Id.* at 57.)

l.  The night before his death, RB was with his son who reported that RB was very sleepy, to the extent that RB had to pull over the car he was driving until RB was able to continue driving home. (*Id.*)

m.  Once home, RB required assistance from his son to get to his bed because of his drowsiness. (*Id.*)

n.  Although RB had received two intramuscular morphine shots at the emergency department in the days preceding his death, the duration of the effect of intramuscular morphine is only four to five hours, and the last shot was administered to RB approximately 29 hours prior to his death and would no longer have been active in RB's body. (*Id.*)

o.  RB's family told investigators that RB acted intoxicated when he took too much morphine, which was how he was acting the night before his death. (*Id.* at 58.)

p.  RB's death cannot be attributed to natural causes, including a heart attack or other trauma. (*Id.* at 58–59.)

q.  Dr. Jain prescribed oxycodone to TB on June 14, 2010. (*Id.* at 62.)

r.  Three days later, TB was found dead on her bed where she had laid down to rest. (*Id.* at 62–63.)

s.  During the hours prior to her death, TB went to the grocery store with friends where she was described as falling asleep as she pushed the cart through the store, exhibiting opioid intoxication. (*Id.* at 62–63.)

t.  After arriving home from the store, TB needed assistance to get to her bed in order to lay down, where she was snoring and then stopped breathing. (*Id.* at 63.)

u.  TB's death cannot be attributed to trauma or natural causes. (*Id.*)

v.  Although there was methamphetamine, alprazolam, quietiapine, and trazadone in TB's post-mortem toxicology results, TB's death is not consistent with a death caused by any of these controlled substances. (*Id.* at 63–65.)

## CONCLUSIONS OF LAW

Based on the Court's Findings of Fact 1–25, the Court concludes that:

1.  The prescriptions that Dr. Jain wrote to MEB for methadone and oxycodone from April 23, 2009 to November 25, 2009, were issued outside the usual course of medical practice and without a legitimate medical purpose.

2.  Dr. Jain's July 27, 2010 prescription of oxycodone to ND was issued outside the usual course of medical practice and without a legitimate medical purpose.

3.  The prescriptions that Dr. Jain wrote for morphine sulfate to RB from October 30, 2009 to June 7, 2010, were issued outside the usual course of medical practice and without a legitimate medical purpose.

4.  The prescriptions for oxycodone that Dr. Jain wrote to TB from December 14, 2009 to June 14, 2010, were issued outside the usual course of medical practice and without a legitimate medical purpose.

5.  The prescriptions for methadone and oxycodone that Dr. Jain wrote to MJB from May 26, 2009 to March 24, 2010, issued outside the usual course of medical practice and without a legitimate medical purpose.

6.  The prescriptions for oxycodone that Dr. Jain wrote to SC from June 2, 2009 to June 24, 2010, were issued outside the usual course of medical practice and without a legitimate medical purpose.

7. The prescriptions for oxycodone, amphetamine/dextroamphetamine, and hydromorphone that Dr. Jain wrote to AU from June 24, 2009 to June 3, 2010, were issued outside the usual course of medical practice and without a legitimate medical purpose.

8. The prescriptions for morphine sulfate and hydromorphone that Dr. Jain wrote to LD from May 11, 2011 to February 23, 2012, were issued outside the usual course of medical practice and without a legitimate medical purpose.

9. The prescriptions for oxycodone and hydromorphone that Dr. Jain wrote to BL from October 28, 2011 to February 13, 2012, were issued outside the usual course of medical practice and without a legitimate medical purpose.

10. The prescriptions for methadone that Dr. Jain wrote to LT from April 4, 2011 to July 6, 2012, were issued outside the usual course of medical practice and without a legitimate medical purpose.

Based on the Court's Findings of Fact 26–35, the Court concludes that:

11. MEB would not have died but for the methadone prescribed to her by Dr. Jain on December 23, 2009.

12. ND would not have died but for the oxycodone prescribed to her by Dr. Jain on July 27, 2010.

13. RB would not have died but for the morphine prescribed to him by Dr. Jain on August 11, 2010.

14. TB would not have died but for the oxycodone prescribed to her by Dr. Jain on June 14, 2010.

**I.  All the prescriptions listed in the Indictment were written by Dr. Jain with no legitimate medical purpose and are relevant conduct for sentencing purposes.**

In his plea agreement, Dr. Jain admitted that he "conducted cursory exams and did not document a therapeutic benefit from the narcotics [he] was prescribing for [MEB]." (Doc. 81 at 4.) He acknowledged that two prescriptions he wrote for MEB for methadone, dated November

25, 2009 and December 23, 2009 "were issued outside the usual course of medical practice and without a legitimate medical purpose." (*Id.*) With this admission, Dr. Jain pled guilty to lesser included offenses in two counts related to MEB: Count 1—Unlawful Dispensing of a Controlled Substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and Count 2—Health Care Fraud in violation of 18 U.S.C. § 1347. (*See* Docs. 64; 81.) The PSR reached a base offense level of 30 by calculating the marijuana equivalency for the total quantities of all the controlled substance prescriptions that Dr. Jain wrote for each of the 10 alleged victims identified in the Indictment. (*See* Doc. 100 ¶ 69.)

Dr. Jain argues that the only drug quantities that should be considered in calculating his base offense level should be those prescribed to MEB, "the patient that forms the basis for the counts to which [he] pleaded guilty," and that calculating the base offense level more broadly "delegitimizes the patients' pain and implies that the patients should not have been treated at all." (*See* Doc. 87 at 8, 2.) Dr. Jain asserts that "[t]he other patients listed on the Second Superseding Indictment can be distinguished from MEB's case and therefore excluding their drug quantities can be legally justified as legitimate and appropriate." (*Id.* at 8–9.)

The Court can consider uncharged conduct as "relevant conduct" in sentencing, so long as the United States has proved that conduct by a preponderance of the evidence. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1131 (10th Cir. 2006). Offenses may qualify as part of the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S. Sentencing Guidelines Manual § 1B1.3(a)(2) cmt. n.5. "Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be

considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.*

Physicians, even those who are registered practitioners legally allowed to dispense narcotics, may still violate the law when they prescribe narcotics in a way that "go[es] beyond approved practice." *United States v. Moore*, 423 U.S. 122, 144 (1975). The Tenth Circuit has held that a physician is subject to prosecution under 21 U.S.C. § 841(a)(1) for unlawfully distributing a controlled substance "if [he] prescribes the substance either outside the usual course of medical practice or without a legitimate medical purpose." *United States v. Nelson*, 383 F.3d 1227, 1231– 32 (10th Cir. 2004); *see also* 21 C.F.R. § 1306.04(a) (2005) ("A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice"). In determining whether a physician has issued medication outside the usual course of professional practice, there is no "specific set of facts" that must be present. *See United States v. MacKay*, 715 F.3d 807, 823 (10th Cir. 2013). Instead, the trial court must look "to the facts in the record to conclude enough facts existed for a fact finder to affirmatively determine that the physician issued the drugs for an improper purpose." *Id.*

In 2017, the Tenth Circuit upheld a trial court's decision to calculate a base offense level by accounting for all the prescriptions issued at a pain management clinic that was operating outside the usual course of medical practice. *United States v. Schwartz*, 702 F. App'x 748, 757 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 751, 199 L. Ed. 2d 618 (2018). In *Schwartz*, the jury found that the clinic "was in fact an illegal drug-distribution operation because it issued prescriptions outside the usual course of medical practice." *Id.* at 751. Because the clinic was determined to be a clear conspiracy to operate an illegal "pill-mill," however, the case did not

center on a debate over whether the government had proved that each and every specific prescription had been illegitimate. *Id.* at 757 ("the *entire* operation was illegal and operating outside of the usual course of medical practice, so *none* of the prescriptions could have been legitimate").

Other courts have similarly upheld decisions to consider the entire volume of pills prescribed by a defendant's clinic for sentencing purposes. *See, e.g.*, *United States v. Brown*, 955 F.2d 45, at *4 (6th Cir. 1993) (affirming drug quantity calculation based on "every [narcotic] prescription issued by [the defendant] over a three-month period," because the evidence showed that "substantially all of [the defendant's] patients visited him to receive illegal prescriptions"); *United States v. Ly*, 543 F. App'x. 944, 948 (11th Cir. 2013) (affirming calculation where the defendant's "treatment of three patients not covered by the indictment constituted relevant conduct" and those prescriptions were thus correctly applied to the calculation); *United States v. Hill*, 254 F. App'x. 405, 407 (5th Cir. 2007) ("the district court may consider drug quantities not specified in the count of conviction if they are part of the defendant's relevant conduct" and thus had not erred in calculating a base offense level including additional "prescriptions for addictive painkillers to patients [the defendant] had not examined").

As described above, the United States has proved by a preponderance of the evidence that all the opioid prescriptions listed in the Indictment that Dr. Jain wrote to MEB fell below the standard of care and were outside the usual course of medical practice. The United States also proved by a preponderance of the evidence that Dr. Jain's prescriptions of controlled substances to each of the other nine patients listed in the Indictment fell below the standard of care much like his treatment of MEB. Dr. Owen testified that each of the nine relevant patient files he reviewed revealed many of the same deviations from the applicable standard of care that were present in

MEB's file. Dr. Jain often conducted cursory exams, kept overall poor documentation and did not note therapeutic benefits or less risky treatment options for patients' pain, and overlooked risk factors for aberrant drug use like addiction history and psychological issues.

In addition, the opioid prescriptions deviating from the standard of care for MEB, ND, RB, TB, MJB, SC, AU, LD, BL, and LT all took place during a relatively similar time period—from April 2009 through July 2012. Many of the illegitimate prescriptions began in the summer of 2009 and continued for a year or more. The various instances listed in the Indictment in which Dr. Jain fell below the standard of care in treating patients with narcotics prescriptions are sufficiently similar, regular, and connected to be considered part of an ongoing series of offenses and "course of conduct." *See* USSG § 1B1.3(a)(2); *see also id.* cmt. n.5. Though Dr. Jain only pled guilty to two illegitimate methadone prescriptions written to MEB, following the guidelines and the standard laid out in *Rodriguez-Felix*, 450 F.3d at 1131, the PSR appropriately bases Dr. Jain's offense level on the marijuana equivalency of *all* the controlled substances he illegally prescribed to his patients named in the Indictment.

## II.     Like MEB, the nine other patients named in the Indictment were vulnerable, and the Court finds that ten vulnerable victims is a large number in this case.

Dr. Jain's next objection involves the PSR's inclusion of a two-level increase for a "large number of vulnerable victims." (Doc. 87 at 29–32.) He argues that the Court must make particularized findings that each victim was in fact vulnerable based on their own characteristics and circumstances. (*Id.* at 29–30.) He also argues that there is no case law or support in the sentencing guidelines for ten patients rising to the level of a "large number" of vulnerable victims. (*Id.* at 31–32.) Dr. Jain does not object to the PSR's inclusion of a two-level upward adjustment for MEB being a vulnerable victim. (*See* Tr. I at 10.)

The issue of whether a patient whose doctor was convicted of illegal prescribing may be considered a "vulnerable victim" based on drug addiction or other risk factors has not been squarely addressed by the Tenth Circuit. In *United States v. Volkman*, a case involving a doctor convicted of unlawfully distributing controlled substances, the Sixth Circuit opined that "drug addiction, standing alone, cannot serve as the basis for applying the enhancement . . . ." 797 F.3d 377, 398 (6th Cir. 2015). However, the Sixth Circuit went on to hold that the trial court had not erred in applying the vulnerable victim enhancement after going beyond general drug addiction to make findings "regarding specific victims' ailments. It noted the mental and emotional frailties of some of [the defendant's] patients by stating that some patients had serious psychiatric problems, some even had prior suicide attempts." *Id.* (internal quotation marks and brackets omitted).

A "large number" is not defined anywhere in the sentencing guidelines. There is no case law on point for determining what constitutes a "large number" of vulnerable victims in cases involving unlawful distribution of controlled substances by medical professionals. However, in *United States v. Kaufman*, the Tenth Circuit upheld a trial court's finding that ten was a "large number" of victims in the context of an involuntary servitude case. 546 F.3d 1242, 1269 (10th Cir. 2008). In *United States v. Caballero*, the Tenth Circuit explained that to find a "large number" for purposes of applying this enhancement, the trial court is required to make "particularized findings of vulnerability pertaining to individual victims." 277 F.3d 1235, 1251 (10th Cir. 2002). "Not only must there be particularized evidence of a victim's vulnerability, but the evidence must also distinguish the victim as atypical of the usual targets of the relevant criminal conduct." *Id.* (citation omitted); *see also United States v. Scott*, 529 F.3d 1290, 1301 (10th Cir. 2008) ("it is not enough that a victim belongs to a class generally considered vulnerable"). In *Caballero*, after upholding the trial court's decision that certain trafficking victims were uniquely vulnerable based on their

immigration status and language barriers, the court explained that "not every victim of fraud, either generally or in [this] particular scheme, struggle with the English language, are uneasy dealing with the legal system, or are in an illegal immigrant status." 277 F.3d at 1251.

The United States bears the burden of proving by a preponderance of the evidence the appropriateness of each upward adjustment to the offense level. Here, the Court finds that the United States met its burden by presenting testimony and expert reports proving that each of the patients named in the Indictment was particularly vulnerable to the harm caused by the unlawful distribution of controlled substances, even beyond the fact that Dr. Jain knew some of the patients were or had been addicted to drugs. Indeed, as evidenced by the Court's findings of fact and conclusions of law listed above, these patients' unique vulnerabilities were often elements of what made the opioid prescriptions Dr. Jain issued to them fall below the standard of care.

MEB exhibited signs of anxiety, depression, and bipolar disorder. Dr. Jain has conceded that MEB was a vulnerable victim for sentencing purposes. ND's file noted unstable behavior and mental health issues. RB's file noted anxiety and depression. TB exhibited anxiety and depression. MJB had a history of sleep apnea, which increases vulnerability to death when taking prescription opioids, as well as a history of recreational drug use. SC had an extensive personal and family history of psychiatric issues including anxiety, depression, and suicidal ideations. AU reported anxiety and depression. LD exhibited depression, anxiety, bipolar disorder, and marital stress. BL had a history of depression and anxiety as well as obstructive sleep apnea. LT had been addicted to heroin for six years and reported as much to Dr. Jain. Dr. Jain documented factors about each of these patients that, like MEB, made them particularly vulnerable to harm associated with illegal dispensing of controlled substances. LT is the only patient for whom the United States did not present any specific evidence of vulnerability beyond drug addiction. However, the Court finds

that here, his documented and self-reported six-year addiction to heroin made him uniquely vulnerable in this scenario to harm caused by illegal dispensing of methadone. Though many of Dr. Jain's vulnerable patients shared mental and physical health issues that made them particularly vulnerable, not every patient that is prescribed opioids, even opioids illegally prescribed with no legitimate medical purpose, necessarily suffers from the mental and physical ailments that these ten patients did. Thus, the Court finds, after careful review of the evidence regarding each patient, that all ten patients named in the Indictment were uniquely vulnerable to Dr. Jain's illegitimate prescriptions of controlled substances.

The Court also finds that the ten vulnerable victims identified in Dr. Jain's case is a large number warranting a two-level increase under the guidelines.[5] Though this case does not, of course, involve involuntary servitude, the fact that the Tenth Circuit endorsed a finding of ten vulnerable victims constituting a large number in *Kaufman* is instructive and lends weight to the Court's ruling here. *See* 546 F.3d at 1242. Therefore, the PSR correctly assesses Dr. Jain an additional two-level enhancement for a large number of uniquely vulnerable patients.

### III. Dr. Jain's prescriptions were the cause of death for four patients, and this information may remain in the PSR.

Dr. Jain objects to the Court considering statements that his prescriptions were the cause of death for several deceased patients named in the Indictment, including MEB, and urges the Court to reject portions of the PSR that state Dr. Jain's prescriptions were the cause of death. (Doc. 87 at 32.) Neither of the lesser included offenses that Dr. Jain ultimately pled guilty to require the death of a patient as an element, and whether victims died does not factor into the offense level

---

[5] Even if the Court declined to consider LT to be "vulnerable" because his sole vulnerability explicitly noted in Dr. Owen's expert report was a history of drug addiction, *see Volkman*, 797 F.3d 377 at 398, nine vulnerable victims in this case still appears to the Court to be a "large number." Though the Sixth Circuit suggested in *Volkman* that drug addiction alone doesn't equate to vulnerability, the Court finds that LT's self-reported, six-year heroin addiction made him clearly and uniquely vulnerable to the harmful effects of an illegal methadone prescription.

calculation. Still, Dr. Jain contests the cause of death findings contained in the PSR to the extent they will influence the Court's sentencing decisions. (*See id.*) Pursuant to the policy statement in USSG § 5K2.1, the PSR notes that judges may consider death as a factor warranting an increased sentence. "If death resulted, the Court may increase the sentence above the authorized guideline range" but "[l]oss of life does not automatically suggest a sentence at or near the statutory maximum." (Doc. 100 ¶ 136.)

As discussed above, the United States has proved by a preponderance of the evidence that four of Dr. Jain's patients, MEB, ND, RB, and TB, would not have died but for Dr. Jain's prescriptions. The deaths resulted from the same course of conduct considered in setting Dr. Jain's base offense level, and thus may be relevant to the Court's determination of what sentence will be sufficient, but not greater than necessary under the circumstances. The references to these four deaths resulting from Dr. Jain's prescriptions will remain in the PSR, but the Court recognizes that they do not necessarily warrant departure and the Court "must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation." (*Id.* (quoting USSG § 5K2.1).)

Pursuant to the PSR, Dr. Jain's total offense level is 33. Based upon a total offense level of 33 and a criminal history category of I, the guideline imprisonment range is 135 to 168 months. Dr. Jain entered a guilty plea to lesser included offenses in Counts 1 and 2 of the Indictment. Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties stipulated to a specific guideline range of 42 to 108 months.

**THEREFORE**,

**IT IS ORDERED** that Defendant Dr. PawanKumar Jain's Objections to the Presentence Investigation Report (Doc. 87) are **DENIED** and the Second Presentence Investigation Report (Doc. 100) is adopted.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**